# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| GUSTAVO CARDENAS, ) | |
| ) | |
| Plaintiff, ) | No. 17 cv 8242 |
| ) | |
| v. ) | Magistrate Judge Susan E. Cox |
| ) | |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gustavo Cardenas ("Plaintiff") appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying him disability benefits under the Social Security Act. The Parties have filed cross-motions for summary judgment. For the reasons below, the Court remands this matter for further proceedings consistent with this Memorandum Opinion and Order.

**I. Background**

   **a. Procedural History**

On December 7, 2013, Plaintiff filed an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §1382(a)(3), alleging disability as of June 1, 2002.[1] [Administrative Record ("R") 313-18.] Plaintiff's claims were denied initially and again at the reconsideration stage, after which Plaintiff timely requested an administrative hearing, held on December 30, 2015 before Administrative Law Judge ("ALJ") Kathleen Kadlec. [R 974-1078.] Plaintiff was represented by counsel, and both a Medical Expert ("ME") and a Vocational Expert ("VE")

---

[1] Plaintiff's counsel has allowed that the earliest Plaintiff would be entitled to benefits on the instant claim is June 1, 2013. [Dkt. 22, fn. 1.] The Court has adopted Plaintiff's explanation for this as follows: On May 2, 2012, a different ALJ found Plaintiff entitled to a "closed period" of disability from June 10, 2003, through November 1, 2005, but that he was not disabled after that date; the Appeals Council effectively affirmed that decision on May 3, 2013, and Plaintiff did not appeal; for the purposes of Title II disability insurance benefits, Plaintiff's date last insured was September 30, 2012; he was therefore ineligible for Title II benefits and was limited to Title XVI SSI benefits beginning June 1, 2013, the month after he filed the instant application for benefits. *Id.* (citing R 219-25, 336; 20 C.F.R. § 404.110; and 20 C.F.R. § 416.335).

testified during the hearing, as did Plaintiff's niece, Lisette Garcia. *Id.* On February 17, 2016, the ALJ issued a written decision denying Plaintiff disability benefits. [R 18-28.] On July 5, 2017, the Appeals Council denied Plaintiff's appeal, and the ALJ's decision became the final decision of the Commissioner. [R 6-12.]

    b. **Plaintiff's Background**[2]

In June 2003, Cardenas fell two stories off scaffolding while working at a construction site and landed on concrete. [R 471, 646.] In January 2004, a CT scan and MRI revealed "marked hydrocephalus," or excessive cerebrospinal fluid ("CSF"), throughout his ventricular system. [R 499, 504.] On January 29, 2004, Plaintiff underwent an operation to implant a right-sided frontal ventriculoperitoneal shunt to allow drainage of the excess CSF. [R 468, 482-83.] Between January 12, 2005 and October 31, 2005, Plaintiff underwent four more operations to replace two malfunctioning shunts, remove an infected shunt and replace it with a temporary external shunt, and, finally, to implant a new shunt. [R 536-37, 605-11.]

In 2010, Plaintiff complained to his doctors about difficulty balancing and with memory. [R 713, 715.] By 2012, Plaintiff was complaining of chronic daily headaches, short-term memory loss, and poor balance. [R 651-52, 658-59, 673, 675, 698, 702, 704, 712.] He was diagnosed with post-concussion syndrome, and imaging revealed that his hydrocephalus was unchanged since 2003. [R 652-53, 660, 673, 675, 700.] As early as September 2010, Plaintiff's doctors theorized that his "vague, chronic symptoms of memory difficulty, balance difficulty, and sleep disturbance may stem from his initial head injury." [R 716.] In March 2012, he was counseled about the relationship between his memory problems and headaches and his diabetes and hydrocephalus. [R 712.]

In June 2014, at the request of the Social Security Administration ("SSA"), Plaintiff appeared for a consultative mental status evaluation with Ericka Swanson, Psy.D. [R 772-75.] He reported, *inter*

---

[2]     The Court limits its discussion of the factual background of this case relevant to the analysis provided herein.

*alia*, difficulty sleeping, feeling "'real weak and tired,'" feeling like he is going to fall, near-daily headaches, passing thoughts of suicide, difficulty remembering things, irritability, and difficulty concentrating. [R 772-73.] Dr. Swanson's examination revealed impaired concentration and memory, and she diagnosed Plaintiff with severe major depressive disorder. [R. 774-75.]

In 2014 and 2015, Plaintiff repeatedly presented to the emergency room seeking for treatment of asthma exacerbations and diabetes-related symptoms, including vertigo and lightheadedness. [R 733, 748, 854, 872, 882, 893, 912, 923, 941, 955, 962, 970.]

### c. The December 30, 2015 Administrative Hearing

At the time of the hearing, Plaintiff was working part-time at a funeral home. [R 985[3].] He worked "maybe once a week, or maybe twice a week." *Id.* He only worked on days that they called him in to help with services, and he made coffee (small 3-4 cup pot), threw out the garbage, sometimes brought flowers into the home (medium-sized arrangements), and sometimes answered the phone or the door. [R 985, 1004-05, 1011, 1013-14.] At the funeral home, his supervisor must tell him what to do throughout the time he is working. [R 1013.]

Sheldon Slodki, M.D., testified as the medical expert at the December 30, 2015 administrative hearing. [R1038-50.] Dr. Slodki testified that while none of Plaintiff's impairments met or equaled a listing, his asthma, hydrocephalus, seizure disorder, memory problems, diabetes, and balance problems are all severe impairments in combination. [R 1047; *see also* R 97[4].] Dr. Slodki explained that Plaintiff's reported symptoms were consistent with his EEG and imaging studies and opined that Plaintiff's "problems with balance, memory loss and insomnia" would cause Plaintiff functional limitations.

---

[3] The record contains two transcripts from the December 30, 2018 hearing. One transcript is incomplete [R 33-119], and indeed reflects that the "audio cuts off" at the end of the hearing [R 119]; a supplemental administrative record was filed containing a "true and corrected transcription" of the December 30, 2015 testimony [*see* dkt. 22, supplemental certification page], which reflects an extra three minutes of testimony, as well as various small transcription differences. [R 974-1078.] The Court cites to the supplemental transcript, unless otherwise noted.

[4] The Court believes the question the ALJ asked of Dr. Slodki related to Plaintiff's severe impairments is likely more correctly reflected in the incomplete transcript at R. 97 than at R 1047 of the corrected transcript, but Dr. Slodki's answer remains the same.

[R 1046, 1048]. When asked whether there was any clear indication as to Plaintiff's memory loss, Dr. Slodki indicated that indeed, "the testimony that you have on record at this hearing has demonstrated the problems with memory." [R 1049-50.]

Grace Gianforte testified as the vocational expert at the December 30, 2015 administrative hearing. [R 1051-75.] In describing Plaintiff's funeral home work, Ms. Gianforte opined that this work was "noncompetitive [work] akin to supportive employment." [R 1054.] The hallmarks in reaching that conclusion were "that there's no independent judgment and decision making associated with the work [Plaintiff was doing]" and that he was just following instructions and directions of someone else throughout the day, which is "very unusual." [R 1056.] She could not think of a job description in the Dictionary of Occupational Titles that matched Plainitff's work at the funeral home. [R 1060.] In response to a hypothetical question reflecting the Administrative Law Judge's ultimate residual functional capacity assessment, Ms. Gianforte testified that such a hypothetical individual could not perform Plaintiff's past work but could perform other light jobs. [R 1065.] However, if the individual required more than the average amount of supervision to perform his duties, such an individual "would need what's called non-competitive supportive employment...[including] a job coach," and competitive work would be precluded. [R 1070-71.]

### d. The ALJ's Decision

On February 17, 2016, the ALJ issued a written decision denying Plaintiff disability benefits. [R 18-28.]

At Step One, the ALJ determined that Plaintiff did not engage in substantial gainful activity since his alleged onset date of May 20, 2013. [R 20.] The ALJ mentioned Plaintiff's funeral home work as below the threshold that meets substantial gainful activity, but did not note that this work was classified by the VE as "supportive employment." *Id.* At Step Two, the ALJ found that Plaintiff had the severe impairments of hydrocephalus, asthma, and diabetes mellitus. *Id.* The ALJ identified Plaintiff's

4

hypertension, old rib fractures, and headaches as nonsevere impairments. *Id.* The ALJ did not classify Plaintiff's seizure disorder, memory problems, or balance problems as either severe or nonsevere. At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.F.R. Part 404, Subpart P, App'x 1. [R 22.]

Before Step Four, the ALJ found that Plaintiff had the residual functional capacity ("RFC")[5] to perform light work except that Plaintiff can never climb ladders, ropes, or scaffolds; can only frequently climb ramps and stairs; can frequently balance; can never be exposed to moving mechanical parts or pulmonary irritants such as dust, odors, or fumes; and that he must have normal breaks to account for off-task time. *Id.* At Step Four, the ALJ found that Plaintiff was not capable of performing his past relevant work, which the ALJ listed as a construction helper. [R 27.] At Step Five, however, the ALJ found that Plaintiff was capable of performing the jobs of clerical stock checker (DOT # 222.687-022), merchandise marker (DOT # 209.587-034), and inspector packer (DOT # 559.687-074), which exist in significant numbers in the national economy. [R 28.]

Because of these determinations, the ALJ found Plaintiff not disabled under the Act. *Id.*

## II. Social Security Regulations and Standard of Review

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; and (3) whether the severe impairment meets or equals one considered conclusively disabling such that the claimant is impeded from performing basic work-related activities. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920(a)(4)(i)-(v). If the impairment(s) does meet or equal this standard, the inquiry is over and the

---

[5] RFC is defined as the most one can do despite one's impairments. 20 C.F.R. §§ 404.1545, 416.945.

5

claimant is disabled. 20 C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ must determine (4) whether the claimant is capable of performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). If not, the ALJ must (5) consider the claimant's age, education, and prior work experience and evaluate whether she is able to engage in another type of work existing in a significant number of jobs in the national economy. *Id.* At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the claimant's RFC in calculating which work-related activities she is capable of performing given his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to the Commissioner to show that there are jobs that the claimant is able to perform, in which case a finding of not disabled is due. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

In disability insurance benefits cases, a court's scope of review is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young*, 362 F.3d at 1001. Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusion," sufficient to allow a reviewing court an ability to assess the findings and provide the claimant meaningful judicial review. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted); *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000). The Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also*, 42 U.S.C.§ 405(g).

### III. Discussion

Plaintiff alleges various errors with the ALJ's opinion. Among them, Plaintiff alleges the ALJ's adverse credibility finding is not supported by substantial evidence as it relates to Plaintiff's part-time, sheltered work at the funeral home. The Court agrees the ALJ did not provide a sufficient explanatory basis for her adverse credibility finding in this regard. Additionally, as it has researched and written this opinion, the Court has, *sua sponte*, discovered the ALJ's Step Five finding was based upon unreliable VE testimony that conflicted with the DOT. For these reasons, detailed more fully below, the Court remands this matter.

#### a. The ALJ's Credibility Finding was not Supported by Substantial Evidence

As part of the credibility finding in the instant matter, the ALJ found Plaintiff not credible, in key part, because he worked part-time after his alleged onset date. [R 26.] Specifically, the ALJ found that

> [Plaintiff's] work history does not support the severity of his allegations. While [Plaintiff] alleged that he had been unable to work since 2002, he also testified that he worked part time at a funeral home for several years and his earnings record shows he worked at below substantial gainful activity levels in 2003, 2006, 2008, 2012 and 2013.

*Id.* This is it; these two sentences comprise the ALJ's entire explanation for "how" Plaintiff's work history allegedly fails to support the severity of his allegations.[6]

However, the Court finds it exceptionally problematic the ALJ did not even mention that Plaintiff's funeral home work was classified by the VE as "noncompetitive [work] akin to supportive employment." [R 1054.] The VE went on to specify that as to the particular "collection of tasks" Plaintiff performs at his funeral home job, she "can't think of a job description" that would match and she noted, "I just don't know how to categorize it" because she had never seen another job like it in her 48-odd years of practice. [R 1060-61.] Essentially, the VE described Plaintiff's funeral home work

---

[6] Even the Commissioner acknowledges the ALJ's "one-sentence conclusion" is "a perhaps lazy analysis." [Dkt. 28, p. 9.] It is difficult to meaningfully review the impact Plaintiff's funeral home job had on the ALJ's credibility finding with such conclusory "analysis." *Clifford*, 227 F.3d at 874.

7

as "'sheltered work,' which is work unavailable in the competitive economy because it is uniquely tailored to the employee's limitations." *Johnson v. Chater*, 969 F. Supp. 493, 501 (N.D. Ill. 1997). Yet despite the lengthy testimony the VE gave on this point,[7] the mention of sheltered work was shockingly omitted from the ALJ's opinion.

An individual's "past performance in sheltered work activity [does] not establish an ability to engage in gainful employment." *Thompson v. Schweiker*, 665 F.2d 936, 940 (9th Cir. 1982); *see also*, *Wilder v. Chater*, 64 F.3d 335, 337-38 (7th Cir. 1995) ("The fact that someone is employed is not proof positive that he is not disabled, for he may be desperate and exerting himself beyond his capacity, or his employer may be lax or altruistic") (citations omitted). Although not explicit, it would seem that the ALJ found Plaintiff's funeral home work inconsistent with his claim that he has been disabled and unable to work since his June 2003 fall off the scaffolding at the construction site that left him with "marked hydrocephalus." The ALJ, however, provided no explanation as to how this makes Plaintiff's allegations less credible, particularly since the work he engages in at the funeral home is clearly a job with functions and supervision tailored to Plaintiff's limited abilities. Thus, the Court agrees with Plaintiff's argument that it was error for the ALJ to omit any explanation of how Plaintiff's inability to find work outside of sheltered, part-time employment renders his allegation of an inability to perform full-time, competitive work less credible. This was an unreasonable error when the sheltered nature of the funeral home work was continually emphasized by the VE throughout her testimony, and the VE's testimony that a person with Plaintiff's RFC who needed more than average supervision (such as a job coach in a sheltered, supportive employment position) would be unemployable. [R 1054-61, 1070-73.]

The Commissioner argues that Plaintiff's part-time work was never a driving factor in the ALJ's finding Plaintiff not disabled, citing, *inter alia*, *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) for the

---

[7] Approximately 13 of the 23 pages of the VE's testimony concerns understanding and attempting to classify the myriad small tasks Plaintiff did in his employment at the funeral home, and how this job constituted no set position in the national economy but was a sheltered work position. [R 1051-1074.]

8

proposition that "[a]n erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." This does not save the Commissioner; in fact, the Court believes *Pierce* supports remand in this matter. Just like in *Pierce*, neither of these factors were met here. Plaintiff's testimony about his funeral home job duties was not incredible on its face (nor contradicted by the administrative record), nor did the ALJ provide any hint that she did not consider Plaintiff's credibility in her decision to find him not disabled. Also like *Pierce*, "we [cannot] be sure that the ALJ would have reached the same conclusion about [Plaintiff's] credibility if the information [s]he considered had been accurate" with respect to the sheltered nature of the work that failed allegedly to support Plaintiff's allegations. *Pierce*, 739 F.3d at 1051. The ALJ's adverse credibility finding requires remand.

Not only did the ALJ fail to note the nature of Plaintiff's part-time work, which is key in the instant matter, but the ALJ did not provide a sufficient explanatory basis for her adverse credibility finding in this regard, and the Court is unable to trace the logical path between this evidence and her conclusion. In sum, despite the deference this Court owes the ALJ's credibility finding, the Court does not believe that the credibility determination in this case is adequately supported by the administrative record (particularly the VE's testimony) and must be reversed and remanded for further proceedings consistent with this opinion. *See Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006) (credibility finding may only be reversed if it is unreasonable or unsupported by the record).

    b.    **Step Five of the ALJ's Decision was Based on Unreliable VE Testimony that Conflicted with the DOT**

The Commissioner bears the burden of proof at Step Five of the inquiry into a claimant's disability to provide "evidence that demonstrates that other work exists in significant numbers in the national economy." 20 C.F.R. § 404.1560; *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008). ALJs frequently rely on VEs to provide information regarding the kinds of work and the number of jobs a hypothetical person with certain conditions and limitations can perform. *See Simila v. Astrue*, 573 F.3d

9

503, 520 (7th Cir. 2009); *Pagos v. Colvin*, 2015 WL 1502923, at *7 (N.D. Ill. Mar. 27, 2015). In demonstrating the existence of work that a claimant is capable of performing, a VE frequently makes use of the DOT. The DOT – the "bible" of VEs – lists job duties, demands, and accompanying mental and physical requirements and skills. *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010); *Haddock v. Apfel*, 196 F.3d 1084, 1089-90 (10th Cir. 1999). The Social Security Administration relies upon the DOT as an "authoritative" publication and its definitions are accepted as reliable evidence of how jobs are performed in the national economy (despite the Seventh Circuit having categorized the DOT as "obsolete" as its entries mostly date back to 1977). *Haddock*, 196 F.3d at 1089-90; *Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir.2014).

A VE's testimony satisfies the Step Five burden of proof only if it is reliable. *Overman*, 546 F.3d at 464; *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). "A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008). While an "apparent conflict" in the VE's testimony is one that exits where it is "so obvious that the ALJ should have picked up on [it] without any assistance," an ALJ's job is not limited solely to apparent conflicts. *Weatherbee v. Astrue*, 649 F.3d 565, 571-72 (7th Cir. 2011); *Overman*, 546 F.3d at 463. SSR 00-4p, which clarifies standards for VEs providing evidence before ALJs in disability decisions, notes that "an ALJ has an affirmative responsibility to ask whether a VE's evidence conflicts with information provided in the DOT before relying on that evidence to support a determination of nondisability." SSR 00-4p at 4; *Overman*, 546 F.3d at 462-63 (internal quotations omitted). Furthermore, SSR 00-4p requires ALJs to investigate and resolve discrepancies when the VE's testimony appears to conflict with the DOT. SSR 00-4p; *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006) ("If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict."). Thus, an ALJ's affirmative duty extends beyond merely asking the VE whether his testimony is consistent with the

DOT; the ALJ also must "elicit a reasonable explanation for any discrepancy." *Overman*, 546 F.3d at 463 (7th Cir. 2008) (citing *Prochaska*, 454 F.3d 731).

Here, the ALJ satisfied SSR 00-4p's first requirement of asking whether the VE's evidence conflicted with the DOT; the VE responded that there was no conflict she was aware of. [R 1066.] However, the ALJ did not satisfy the second prong of SSR 00-4p when she failed to investigate and resolve what should have been readily apparent inconsistencies between the VE's statements and the DOT, leading to a decision that lacks substantial evidence.

At Plaintiff's administrative hearing, the VE identified three jobs she believed to be consistent with the RFC limitations provided by the ALJ. [R 1065-66.] However, two of the three positions conflicted facially with the DOT, and at least one of those conflicted substantively. First, the VE testified that based on the ALJ's RFC assessment, an individual with Plaintiff's restrictions could perform the jobs of "clerical stock checker" (identified by the VE as DOT # 222.687-022), "merchandise marker" (identified by the VE as DOT # 209.587-034), and "inspector packer" (identified by the VE as DOT # 559.687-074). However, according to the DOT, per the corresponding code provided by the VE, the clerical stock checker job identified as suitable for Plaintiff's limitations is actually classified as a "routing clerk (clerical),"[8] which is in an entirely different field of endeavor than described by the ALJ. (There *is* a separate job that exists with the title of clerical stock checker at DOT # 222.387-058.[9]) Similarly, according to the DOT, per the corresponding code provided by the VE, the

---

[8] DOT Code 222.687-022: ROUTING CLERK (clerical) - Sorts bundles, boxes, or lots of articles for delivery: Reads delivery or route numbers marked on articles or delivery slips, or determines locations of addresses indicated on delivery slips, using charts. Places or stacks articles in bins designated according to route, driver, or type. https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT02B.HTM (accessed October 15, 2018).

[9] DOT Code 222.387-058: STOCK CLERK (clerical) [alternate title: stock checker] - Receives, stores, and issues equipment, material, supplies, merchandise, foodstuffs, or tools, and compiles stock records in stockroom, warehouse, or storage yard: Counts, sorts, or weighs incoming articles to verify receipt of items on requisition or invoices. Examines stock to verify conformance to specifications. Stores articles in bins, on floor, or on shelves, according to identifying information, such as style, size, or type of material. Fills orders or issues supplies from stock. Prepares periodic, special, or perpetual inventory of stock. Requisitions articles to fill incoming orders. Compiles reports on use of stock handling equipment, adjustments of inventory counts and stock records, spoilage of or damage to stock, location changes, and refusal of shipments. May mark identifying codes, figures, or letters on articles, using labeling equipment. May distribute stock among production workers, keeping records of material issued. May make

inspector packer job identified as suitable for Plaintiff's limitation is actually titled as an "inspector and hand packager (plastic prod.)."[10]

Several factors produced unresolved confusion in the VE's testimony. First, the DOT code the VE provided for the clerical stock checker position corresponds to a job that is substantively different than the clerical stock job. This error should have been plainly obvious to the ALJ with barely a modicum of research, as it was readily apparent to the Court that these titles and codes did not match, yet the ALJ did not mention it nor resolve it. Instead, the ALJ wholesale adopted the erroneous testimony provided by the VE. Second, the VE offered little to no substantive description of the clerical stock checker position which would have allowed the ALJ to reasonably determine whether the RFC hypothetical posed by the ALJ was applied to the job title or the job code provided by the VE, let alone if the job code or job title provided was suitable for Plaintiff. In fact, the entirety of the VE's description of the clerical stock checker position was: "[t]hese jobs are found in general merchandise stores." [R 1065.] Absent descriptive VE testimony, it is difficult to decipher these key facts about the jobs the VE (and, by adoption, the ALJ) is alleging an individual with Plaintiff's abilities can perform.[11] Third, the DOT defines clerical stock checker as SVP level 4, while the VE's testimony provided an SVP of 2 to the job. As a result, it is again unclear if the position the VE determined Plaintiff could perform was based on the DOT code or the job title she supplied. Lastly, because of the conflict in the job title/DOT

---

adjustments or repairs to articles carried in stock. May determine methods of storage, identification, and stock location, considering temperature, humidity, height and weight limits, turnover, floor loading capacities, and required space. May cut stock to size to fill order. May move or transport material or supplies to other departments, using hand or industrial truck. May maintain inventory and other stock records, using computer terminal. https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT02B.HTM (accessed October 15, 2018).

[10] DOT Code 559.687-074: INSPECTOR AND HAND PACKAGER (plastic prod.) - Inspects molded plastic products, such as bottle caps or tops, for defects, and packs inspected products into shipping cartons: Visually examines molded products for defects, such as scratches, discoloration, and flash, and discards defective products. Packs inspected product in cartons according to customer specifications, and carries cartons to storage area. ay attach metal bands to bottle tops prior to packing to form necks for bottles and measure necks to ensure specified length, using gauge. https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT05F.HTM (accessed October 15, 2018).

[11] The VE's entire description of the inspector packer position was similarly vague: "[t]ese jobs are found in rubber, plastics industry, electric, electronic industries." [R 1066.] Yet both the DOT code and title contradict this description, as the "inspector and hand packager (plastic prod.)" position is described as existing exclusively in the plastics industry.

code, it is unclear whether the VE used the job title or the DOT code to support her job availability findings.[12]

The record before us does not indicate that the VE's conflicting testimony was due to reliance on personal knowledge that supplemented or superseded the DOT, or reliance on another credible publication. Rather, it appears the VE's conflicting testimony was an error. While we decline to conclusively determine what constitutes "apparent conflict," it is clear at present that without clarifying the conflict in the jobs provided in the VE's testimony and the DOT, the ALJ's decision is based on unclear and potentially erroneous VE statements, resulting in pattern of reasoning at Step Five of the disability determination that cannot be logically traced. *Id.* at *6.

Because the job codes and titles supplied by the VE substantively conflict with the DOT, and the VE provided little descriptive testimony of the occupations Plaintiff is capable of performing, the Court lacks the tools to resolve the conflict in the VE's testimony. The ALJ did not seek any clarification and instead adopted the VE's testimony verbatim into her Step Five analysis and finding of "not disabled." Accordingly, the ALJ failed to build a logical bridge between the evidence and findings, and the case must be remanded. *See Overman*, 546 F.3d at 465 (where ALJ's ruling is based on testimony that conflicted with the DOT and "otherwise was vague and confusing, the case must be remanded for further proceedings."); *see also*, *Newcomb v. Berryhill*, 2017 WL 3189475, at *4-6 (N.D. Ill. July 27, 2017). This matter requires remand for resolution of the conflict between the VE's testimony and the DOT.[13]

---

[12] The VE testified: "At the light level there'd be a Clerical Stock Checker, 222.687-022, SVP 2. These jobs are found in general merchandise stores. There's about 172,000 nationally, about 10% regionally." [R 1065.] The Court cannot tell if these job availability numbers correspond with the job title or the DOT code listed.

[13] It is of no moment this issue is raised *sua sponte* by the Court instead of by Plaintiff. *Brown v. Colvin*, 845 F.3d 247, 254-55 (7th Cir. 2016) ("[w]e have repeatedly noted that if a vocational expert's testimony appears to conflict with the DOT, the ALJ must obtain a reasonable explanation for the apparent conflict, and that a claimant's failure to object during a hearing cannot excuse an ALJ's failure to do so.") (citing *Overman*, 546 F.3d at 462-63) (signals omitted). The Seventh Circuit defines "apparent conflict" between the DOT and VE testimony under SSR 00-4p as conflict "obvious enough that the ALJ should have picked up on [it] without any assistance." *Overman*, 546 F.3d at 463. "The threshold for apparent conflict requiring ALJs to further examine VE's testimony remains, however, without a bright line." *Newcomb*, 2017 WL 3189475, at *5 (discussing *Prochask*a, 454 F.3d at 736 and *Weatherbee*, 649 F.3d at 571-72 regarding what discrepancies may or may not create an apparent conflict)).

### c. Unaddressed Medical Issues

While we are remanding this matter for the two reasons above, we found it worth mentioning our concern that the ALJ failed to address, at Step Two, the severity (or nonseverity) of Plaintiff's seizure disorder, memory problems, or balance problems.

Once again, at Step Two, the ALJ found that Plaintiff had the severe impairments of hydrocephalus, asthma, and diabetes mellitus. [R 20.] The ALJ identified Plaintiff's hypertension, old rib fractures, and headaches as nonsevere impairments. *Id.* The ALJ did not classify Plaintiff's seizure disorder, memory problems, or balance problems as either severe or nonsevere.

First, it is curious the ALJ left these medical issues unaddressed in light of the ME's testimony that Plaintiff's asthma, hydrocephalus, seizure disorder, memory problems, diabetes, and balance problems are all severe impairments in combination. [R 1047.] Next, the failure to address Plaintiff's memory problems in particular is concerning to the Court, as these memory problems are plainly reflected in the entirety of the record before us, most strikingly the whole of Plaintiff's testimony at both the December 30, 2015 administrative hearing [R 983-1026, 1052-56] and the earlier February 8, 2012 administrative hearing [R 125-58]. While the Court, admittedly, was not present at either of these hearings,[14] the transcripts reflect a Plaintiff who genuinely appears not to remember very basic information; he comes across as someone with a traumatic brain injury rather than someone deceitful.[15] On this point, the ME in the 2015 hearing, after having sat through Plaintiff's testimony at that hearing, remarked of Plaintiff's memory problems and whether there was any clear indication as to Plaintiff's memory loss: "the testimony that you have on record at this hearing has demonstrated the problems with memory." [R 1049-50.] Therefore, while we make no findings on this point, it is curious that with the record before us, the ALJ left essentially unaddressed Plaintiff's seizure disorder, memory problems,

---

[14] The ALJ who issued the decision in this matter was present at the 2015 hearing, but not at the 2012 hearing.

[15] The testimony of Plaintiff's supporting witnesses at the hearings also lend credence to Plaintiff's memory issues.

and balance problems. The Commissioner may want to revisit this on remand.

## IV. Conclusion

Due to the errors in the ALJ's adverse credibility finding and her Step Five analysis, the Court must reverse and remand for proceedings consistent with this opinion. At this time, the Court offers no opinion as to the other alleged bases of error in the ALJ's decision as raised by Plaintiff. Plaintiff's motion for summary judgment [dkt. 22] is granted; the Commissioner's motion for summary judgment [dkt. 27] is denied.

Entered: 10/26/2018

_____
U.S. Magistrate Judge, Susan E. Cox